UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  S1-4:15 CR 553 JAR (JMB) |
| | ) | |
| KYLE MAURICE PARKS, | ) | |
| | ) | |
| Defendant. | ) | |

**RE-ISSUED REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Currently before the Court is Defendant Kyle Maurice Parks' Motion to Suppress Evidence ("Parks' Motion to Suppress").  (ECF No. 53)[1]  The government filed an opposition to Parks' Motion to Suppress.  (ECF No. 54)  The undersigned recommends that Parks' Motion to Suppress be denied.

**STATEMENT REGARDING RE-ISSUED REPORT & RECOMMENDATION**

On August 8, 2016, the undersigned issued a Report and Recommendation regarding Parks' Motion to Suppress.  (ECF No. 66)  On August 10, 2016, the Grand Jury returned a Superseding Indictment, expanding the charges against Parks.  On August 11, 2016, as a result of the Superseding Indictment, the matter was referred back to the undersigned for further pretrial proceedings.  (ECF No. 70)  Accordingly, on August 11, 2016, the undersigned issued an order withdrawing the Report and Recommendation.  (ECF No. 71)

On August 18, 2016, Parkes appeared, with counsel, for his re-arraignment on the

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge, under 28 U.S.C. § 636(b).

Superseding Indictment. (ECF No. 73) At that time, the undersigned gave Parks until September 8, 2016, to file any additional pretrial motions in this matter. It was agreed that Parks' prior Motion to Suppress (ECF No. 66) remained under submission. Parks has elected not to file any additional motions. (ECF No. 76) Defendant's Motion to Suppress, therefore, is the only pretrial motion pending.

The undersigned hereby re-issues the previous Report and Recommendation.

## **BACKGROUND**

In general, Parks contends that the police searched his minivan unlawfully on December 4, 2015, because the police did not first obtain a warrant and no exception to the Fourth Amendment's warrant requirement applies. As a result, the evidence seized from the minivan, including evidence contained on several cell phones, must be suppressed.[2] The government contends that the police searched the minivan lawfully, pursuant to the automobile exception to the warrant requirement. The government further contends that, even if the automobile exception is not applied, the same evidence would have been found during a lawful inventory search of the van after it was towed pursuant to a standard policy.

The undersigned held an evidentiary hearing in this matter on June 29, 2016. Defendant was present and represented by his attorney Joseph M. Hogan. The government was represented by Assistant United States Attorney Howard J. Marcus.

The government presented the testimony of four law enforcement witnesses: Sgt. Adam Kavanaugh, St. Louis County Police Department; Officer Paul Yadlosky, St. Charles Police Department; Officer Daniel Allen, St. Charles Police Department; and Det. Matthew Black, City

---

[2] The government obtained warrants to search the cell phones after they were seized.

of Bridgeton Police Officer.[3]  Sgt. Kavanaugh testified regarding human trafficking in general, as well as his personal involvement in the investigation leading to the current federal charges against Parks.  Officer Paul Yadlosky testified regarding the circumstances associated with an initial search of Parks' van while it was parked in front of the St. Charles Police Department, as well as a later search after summoning a drug detecting dog to the scene.  Officer Allen is a canine officer.  Officer Allen testified regarding the use of his drug detecting dog "Nitro," and the search of Parks' van after Nitro alerted to the presence of narcotics in the van.  Finally, Det. Black testified regarding photographs of the van and that he was the seizing officer for items seized from the van.

Defense counsel cross-examined each witness thoroughly, often using documents, reports, and photographs associated with the search of Parks' minivan.

The undersigned received the following exhibits in evidence at the hearing.

| Exhibit Number | Description |
| --- | --- |
| Gov't 1 | Records and Certification for Police K-9 "Nitro" |
| Gov't 2 | Towing and Inventory Police – St. Louis County Police |
| Def. 1-11 | Photographs of Parks' Van (taken by Det. Black) |
| Def. 12 | St. Charles Police Incident Report 15-010278 |

At the conclusion of the hearing, the parties requested the opportunity to submit post-hearing memoranda, after a transcript of the hearing was available.  The parties have submitted their respective memos.  (ECF Nos. 64, 65)

Based on the testimony and evidence adduced at the evidentiary hearing, having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses, and having fully considered the parties' written submissions, the undersigned makes the following findings

---

[3] Sgt. Kavanaugh and Det. Black work as part of a human trafficking task force, and are also FBI Task Force Officers.

3

of fact, conclusions of law, and recommendation.

## FINDINGS OF FACT

1. On December 3, 2015, police in St. Charles, Missouri, received information regarding a missing and endangered female juvenile, "T.S.," from Columbus, Ohio. Cell phone records indicated that the phone used by T.S. was at a Red Roof Inn hotel, on Zumbehl Road, in St. Charles, Missouri. The Red Roof Inn is approximately one-quarter mile from the St. Charles Missouri Police Department. At approximately 9:00 p.m., St. Charles police officers went to the Red Roof Inn and observed a minivan with an Ohio temporary license plate/tag. The police determined that the van was registered to Kyle Parks. The police contacted the Columbus, Ohio, police and were advised that Parks was known to the Columbus police for prostitution and human trafficking activities.

2. While at the Red Roof Inn, the St. Charles police officers also learned that, although there were no rooms rented in Parks' name, there were two rooms occupied by young girls from Ohio—Rooms 232 and 233. The St. Charles officers went to the rooms, and after observing the rooms, contacted St. Louis County Police Sergeant Adam Kavanaugh.

3. The St. Louis County Police host a multi-jurisdiction human trafficking task force, which includes both state and federal law enforcement agencies. Sgt. Kavanaugh has been a police officer for more than twenty years and is a supervisor in the Special Investigations Unit of the St. Louis County Police Department. The Special Investigations Unit investigates, among other things, child exploitation, human trafficking, and prostitution. Sgt. Kavanaugh has extensive experience investigating human trafficking and child exploitation crimes. Sgt. Kavanaugh participates in the human trafficking task force and is also a task force officer with the FBI. Sgt. Kavanaugh has participated in hundreds of prostitution investigations. Sgt.

4

Kavanaugh has received specialized training from the FBI and other groups regarding human trafficking and prostitution.

4. Sgt. Kavanaugh and other task force detectives arrived at the Red Roof Inn at approximately 11 p.m. on December 3, 2015. The investigators went to two rooms at the hotel—Rooms 232 and 233. There were three females in Room 232: (1) T.B., who was 16 years old; (2) K.O., who was 24 years old; and (3) T.S. who was 17 years old.[4] There were two females in Room 233: (1) R.W., who was 19 years old; and (2) T.M., who was 17 years old. Parks was not present in either room.

5. Sgt. Kavanaugh and the investigative team requested and received consent to search the hotel rooms. Sgt. Kavanaugh described Room 232 as cluttered, with the beds in disarray. Sgt. Kavanaugh observed used and unused condoms in Room 232, as well as receipts, prepaid cards (e.g., gift cards and similar access devices), and male clothing. Room 233 contained drug paraphernalia as well as condoms.

6. Sgt. Kavanaugh testified that Rooms 232 and 233 were being used in a manner consistent with prostitution. Sgt. Kavanaugh explained that it is common to rent two hotel rooms for prostitution activities. One room is used for sex acts and the other room is where the trafficker and other girls stay.

7. Sgt. Kavanaugh also testified as to the significance of prepaid cards observed in one of the rooms. Sgt. Kavanaugh referred to prepaid cards as "vanilla cards." Human traffickers use websites such as Backpages.com ("Backpages") to advertise sex for sale. According to Sgt. Kavanaugh, Backpages does not permit such advertisements to be paid for using credit cards. Therefore, traffickers use "vanilla cards" to purchase Bitcoin (virtual or

---

[4] T.S. was the missing/endangered juvenile from Ohio.

digital currency) which can be used to purchase and post ads on Backpages.

8. Sgt. Kavanaugh and the task force detectives interviewed all five female occupants located in Rooms 232 and 233 at the Red Roof Inn. These females advised that they had been driven to the St. Louis area by Parks. Some of the females were told by Parks what they would do and some were not. The girls indicated that, after they arrived at the hotel, Parks told them to shower and get ready to be posted on Backpages.

9. K.O. (an adult) and T.S. (the missing juvenile) both advised that they committed acts of prostitution at the hotel and gave the money to Parks, who gave some of the money back to the girls. K.O. stated that she had previously worked as a prostitute for Parks in Columbus, Ohio.

10. Through their investigation, Sgt. Kavanaugh and the task force detectives learned that, in addition to Parks, there were two unaccounted for females—a juvenile referred to as "S" and Amber, an adult and purported heroin addict from the St. Louis area who had met the group at the Red Roof Inn. Parks, Amber, and S reportedly left the hotel prior to Sgt. Kavanaugh arriving on December 3, 2015.

11. Officer Paul Yadlosky has been an officer with the St. Charles Police for approximately thirteen years. Officer Yadlosky was on duty the morning of December 4, 2015, at the St. Charles Police Station, on Zumbehl Road. During roll call on the morning of December 4th, Officer Yadlosky and other officers were briefed on the incident at the Red Roof Inn from the night before. As a result of that briefing, Officer Yadlosky learned that the incident involved prostitution with juveniles from Ohio. Officer Yadlosky was advised to look for a man driving a minivan with Ohio temporary tags.

12. Around 8 a.m., on December 4, 2015, Parks entered the lobby of the St. Charles

Police Station. A booking officer notified Officer Yadlosky that the man from Ohio who the detectives were looking for was in the lobby.

13. Officer Yadlosky went to the lobby and met with Parks. Parks inquired about getting a friend out of jail. Parks identified his friend as "Marie," but he was unable to provide a last name or date of birth. Parks indicated they were friends from Ohio. Officer Yadlosky notified detectives from the St. Charles Police who escorted Parks to an interview room.[5]

14. After the detectives left with Parks, Officer Yadlosky observed a minivan backed into a parking spot in the public parking lot in front of the St. Charles Police Station. The minivan had an Ohio temporary tag. At this time, Officer Yadlosky was aware that there was a minor female who had been with Parks but whose whereabouts were then unaccounted for. Officer Yadlosky looked inside the minivan through the windows and observed what he believed to be a female, covered and sleeping in the middle row of seats. Officer Yadlosky also observed a lot of clutter in the minivan. Officer Yadlosky knocked on the window multiple times to get the person's attention but was not successful. As a result, Officer Yadlosky opened the minivan door to check on the person's wellbeing. Officer Yadlosky did not seek permission from anyone before opening the minivan door.

15. Upon opening the minivan door, Officer Yadlosky detected a strong odor of marijuana coming from inside the van.[6] The person in the minivan appeared to be high or intoxicated. Officer Yadlosky believed the person in the minivan was a juvenile. The person in

---

[5] During the evidentiary hearing, Officer Yadlosky positively identified Parks as the person he observed at the St. Charles Police Station on December 4, 2015.

[6] Officer Yadlosky testified that, based on his experience in law enforcement, he was familiar with the smell of marijuana and the smell inside the van was both obvious and overwhelming. Officer Yadlosky prepared a report regarding the marijuana but did not include the fact that he smelled the odor of marijuana upon opening the minivan door or that he searched the minivan. (Def. Exh. 12) Officer Yadlosky wrote a ticket to S for the suspected marijuana.

7

the van was later identified as "S"—the previously unaccounted for juvenile female. As S sat up in the van, Officer Yadlosky observed what he believed to be a bag of suspected marijuana on the floor of the minivan by her feet. S was removed from the minivan and eventually placed in the custody of St. Louis County Police officers.

16. After S was removed from the minivan, Officer Yadlosky conducted what he described as a cursory search of the vehicle to make sure there was nobody else inside. There were no other occupants inside the minivan.[7]

17. Officer Yadlosky next requested that a drug-detecting dog be brought to the minivan. Officer Daniel Allen arrived shortly thereafter with "Nitro," a trained and certified drug detecting K-9. (Gov't Exh. 1) Nitro had been trained to alert to the presence of various narcotic odors, including marijuana. Nitro alerted to the front driver's side passenger door of the minivan.

18. After the dog alerted to the minivan, Officers Yadlosky and Allen conducted a more thorough search of the vehicle. Among other things, the officers observed two cell phones, gift cards, and dozens of condoms in the minivan.

19. City of Bridgeton Police Detective Matthew Black is part of the St. Louis County human trafficking task force and an FBI Task Force Officer. On December 4, 2015, Det. Black went to the St. Charles Police Department as part of the investigation into possible human trafficking and prostitution activities by Parks. Sgt. Kavanaugh and Det. Slaughter, another St. Louis County Police Officer, were also present. Det. Black took photographs of the minivan and

---

[7] Officer Yadlosky initially testified that he observed condoms and cellphones during his cursory search. Those items, however, were found underneath other items inside a red bin. Later in his testimony, Officer Yadlosky clarified that he did not look into or move the bin during the cursory search, and that he looked into the red bin after K-9 Nitro alerted to the presence of drugs in the vehicle.

was the official seizing officer for the evidence located in the minivan. Det. Black testified that, among other items, the police seized multiple gift cards (including vanilla cards), cell phones, receipts, miscellaneous papers, and approximately 88 condoms.

20. Parks was arrested and a federal complaint was issued later on December 4, 2015. (See 4:15 MJ 7345 SPM).[8] After the minivan was searched and the evidence seized, the vehicle was towed and inventoried by the St. Louis County Police, pursuant to a St. Louis County Police policy applicable to vehicles left on public lots.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATION

Parks contends that the search of his minivan on December 4, 2015, was an unlawful search incident to his arrest. The government contends that the police conducted a lawful search under the automobile exception to the Fourth Amendment's warrant requirement.

### I. Was the Warrantless Search of Parks' Van Constitutional?

Under the Fourth Amendment, searches of private property that are conducted without a warrant are generally unconstitutional. See United States v. Blaylock, 535 F.3d 922, 926 (8th Cir. 2008) ("Generally, a warrant is required to ensure a search's reasonableness.") (citation omitted). It is not disputed in this case that the police searched Parks' minivan without first obtaining a warrant. Thus, unless an exception to the warrant requirement applies, the search was unconstitutional.

In his Motion to Suppress, Parks focuses primarily on the question of whether the police were authorized to search his minivan under the search incident to arrest exception to the warrant requirement. The government, on the other hand, argues that the van search was lawful under

---

[8] The complaint charged Parks with transporting a person under the age of 18 in interstate commerce with the intent that the person engage in prostitution, in violation of 18 U.S.C. § 2432(a).

9

the automobile exception. The undersigned agrees with the government. Based on the facts and circumstances of the case, this Court need not consider whether the search incident to arrest exception applies, because the police could lawfully search Parks' minivan pursuant to the automobile exception to the warrant requirement.

A threshold question, therefore, is whether and when police had probable cause to search Parks' van. Based on the facts adduced at the evidentiary hearing, the undersigned concludes that the police had probable cause to search the van no later than the moment it was discovered on the St. Charles Police Department parking lot. But even if the police lacked probable cause to search the van immediately upon discovering it, the undersigned concludes that Officer Yadlosky justified in opening the van door to check on the welfare of the occupant inside. Once the van door was open, there can be no doubt that probable cause existed to search the van due to the overwhelming odor of marijuana.

### A. Automobile Searches

"The Fourth Amendment forbids unreasonable searches and seizures. It is well settled that a warrantless search of an automobile is not unreasonable if law enforcement officers have probable cause to believe that the vehicle contains evidence of criminal activity." United States v. Daniel, 809 F.3d 447, 448- 49 (8th Cir. 2016) (citing United States v. Ross, 456 U.S. 798, 823-24 (1982)). See also United States v. Shackleford, -- F.3d --, 2016 WL 4010513 at *2 (8th Cir. July 27, 2016). "Probable cause exists when the facts available to an officer would warrant a person of reasonable caution to believe that contraband or other evidence of a crime is present." Daniel, 809 F.3d at 449 (citing Florida v. Harris, 133 S. Ct. 1050, 1055 (2013)). See also United States v. Zamora-Garcia, -- F.3d --, 2016 WL 4087238 at *3 (8th Cir. Aug. 2, 2016) (probable cause standard); United States v. Aguilera, 625 F.3d 482, 486 (8th Cir. 2010)

(automobile exception applies when there is probable cause that the vehicle contains contraband or evidence of a crime). If the officers have probable cause to search the entire vehicle, then they may also search containers and compartments within the vehicle. See Ross, 456 U.S. at 821 n.28; United States v. Coleman, 700 F.3d 329, 336 (8th Cir. 2012) ("'If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.'") (quoting Ross, 456 U.S. at 825); United States v. Webster, 625 F.3d 439, 445-46 (8th Cir. 2010); United States v. Wells, 347 F.3d 280, 287-88 (8th Cir. 2003).[9]

The automobile exception to the warrant requirement should not be confused with the search-incident-to-arrest exception. Although the factual circumstances giving rise to these exceptions may overlap, in Arizona v. Gant, 556 U.S. 332 (2009), the Supreme Court rejected the broader rule of New York v. Belton, 453 U.S. 454 (1981), which permitted officers to search the passenger compartment of a vehicle incident to a lawful arrest. Gant, however, did not alter or eliminate the automobile exception. See United States v. Parish, 606 F.3d 480, 487 (8th Cir. 2010). Unlike Gant, "[t]he automobile exception requires probable cause to believe contraband or evidence of *any* crime will be found in the vehicle, not merely reason to believe evidence of the crime of arrest will be found." Shackleford, 2016 WL 4010513 at *2 n. 2.

**B.   Analysis – Automobile Searches**

In order to properly evaluate Parks' motion, the undersigned will first identify the relevant facts, as they existed, prior to the point at which Officer Yadlosky approached Parks'

---

[9] "[U]nder the Fourth Amendment, the subjective motives of the police are not controlling. The dispositive question is whether the police had probable cause to believe the vehicle contained evidence of criminal activity." Daniel, 809 F.3d at 449.

minivan in the police parking lot during the morning of December 4, 2015.[10] If the officers had probable cause to search the van before even approaching it, then Parks' motion to suppress cannot be sustained. In this regard, the undersigned concludes that, when the collective knowledge of the investigative team is considered, there was ample probable cause to search the minivan once it was identified on the parking lot.

1.  **Collective Knowledge of Investigative Team**

"The collective knowledge doctrine imputes the knowledge of all officers involved in an investigation in order to uphold "'an otherwise invalid search or seizure.'"[11] United States v. Banks, 514 F.3d 769, 776 (8th Cir. 2008) (quoting United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir. 2001)). See also Shackleford, 2016 WL 4010513 at *2. Thus, "probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." United States v. Horne, 4 F.3d 579, 585 (8th Cir. 1993) (applying collective knowledge doctrine in context of a minivan search). See also White v. United States, 448 F.3d 250, 254 (8th Cir. 1971) (explaining that, "in determining

---

[10] Parks cannot credibly contend that Officer Yadlosky could not lawfully approach his vehicle. On the facts of this case, Officer Yadlosky would have been well justified in approaching and looking through the window of the parked minivan—it was parked on the police station lot, and Officer Yadlosky had at least reasonable suspicion that the van had been used in connection with prostitution activities. See United States v. Evans, -- F.3d --, 2016 WL 4011174 at *2 (8th Cir. July 27, 2016) (noting in the context of a plain view search of a car, that the Court first considers whether the police "ha[d] a right to be in close proximity to the vehicle") (citations omitted). See also id. at* 3 (quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) ("[A] person who parks a car—which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car.")).

[11] The undersigned does not intend to suggest that the van search was "otherwise invalid." Indeed, as explained below, even if the collective knowledge doctrine is not applied, Officer Yadlosky was justified in approaching the van, looking into the van, and opening the door when the occupant did not respond after he knocked on the window several times.

whether probable cause [to search] existed we must evaluate the collective information of all of the officers") (quotations and citations omitted). In this regard, there must be a degree of communication between the investigators "to 'distinguish between officers functioning as a … team and officers acting as independent actors who merely happen to be investigating the same subject.'" Banks, 514 F.3d at 776 (quoting Gillette, 245 F.3d at 1034). The collective knowledge doctrine applies to warrantless searches under the automobile exception. See Shackleford, 2016 WL 4010513 at *2-3.

Officer Yadlosky testified that, on the morning of December 4, 2015, during roll call at the St. Charles Police Department headquarters, he and other officers were given information from detectives relative to the prostitution activities at the Red Roof Inn the night before. Officer Yadlosky was aware that the activities involved multiple women, including some suspected juveniles from Ohio. Officer Yadlosky had been advised to look for a man driving a van with Ohio temporary tags. Officer Yadlosky was also aware that there was potentially another juvenile female who was at that point unaccounted for. The St. Charles Police Department headquarters building was located about a quarter of a mile from the hotel in question. Shortly thereafter, Parks appeared at the police headquarters. Officer Yadlosky spoke with Parks. Parks inquired about bonding out a person named Marie, but he could not provide a last name. Parks indicated that Marie was his friend and that they were from Ohio.

Based on the foregoing, the undersigned concludes that there was at least "some degree" of communication between Officer Yadlosky and the other investigators involved in the human trafficking and prostitution investigation linked to Parks' minivan. Officer Yadlosky had been briefed on the major points of the investigation and advised to specifically look for a van with Ohio temporary tags. Therefore, entire investigative team's knowledge may be pooled under the

collective knowledge doctrine in considering the question of whether probable cause existed to search Parks' minivan as soon as it was discovered on the parking lot.

### 2. Facts Regarding Probable Cause

The record established during the evidentiary hearing demonstrates that the investigative team as a whole possessed sufficient probable cause to justify a search of Parks' minivan before Officer Yadlosky approached the vehicle on a public parking lot and before he opened the door. During the evening of December 3, 2015, officers from multiple agencies were investigating human trafficking and prostitution activities at the Red Roof Inn hotel, on Zumbehl Road, in St. Charles, Missouri. The officers were specifically looking for an allegedly endangered juvenile from Ohio referred to herein as T.S. Officers observed a minivan in the parking lot of the Red Roof Inn. The minivan had an Ohio temporary tag that was registered to Parks. Officers had been informed that Parks had a history of human trafficking and prostitution-related activity in Ohio. Sgt. Kavanaugh, an experienced and supervisory officer with the St. Louis County Police Department, and other officers located five suspected prostitutes in two rooms at the Red Roof Inn—Rooms 232 and 233. Three of the suspected prostitutes were under the age of 18, and one was the endangered juvenile T.S. Sgt. Kavanaugh observed indicia of prostitution in the hotel rooms, including soiled and unused condoms, prepaid and gift cards, and drug paraphernalia.

The investigating officers interviewed the occupants of the rooms and were advised that Parks had driven them to the St. Louis area, and that after they arrived at the hotel, Parks told them to clean up and get ready to be posted on Backpages. Sgt. Kavanaugh was familiar with the use of Backpages to promote prostitution activities. Two of the females, including T.S., advised that they had committed acts of prostitution at the hotel and given money to Parks.

Parks was not present in either room when the officers arrived. The investigating officers

14

also learned that there were two other people associated with the group that were not present. One was a juvenile female referred to as "S," and the other was an adult female drug user named Amber. The officers were advised that Amber, S, and Parks left before the police arrived.

During the morning of December 4, 2015, Parks arrived at the St. Charles Police headquarters and parked his van in the public parking lot. Parks entered the headquarters building and inquired about a female friend of his from Ohio named "Marie." Parks could not provide a last name for Marie. At approximately this point in time, Officer Yadlosky left the police building and went onto the parking lot where he observed Parks' van, backed into a parking space.

Based on the totality of the circumstances existing during the early morning of December 4, 2015, the police had probable cause to believe that Parks had transported adult and juvenile prostitutes from Ohio to Missouri in the minivan. The police had probable cause to believe that at least two of the females, including one minor, engaged in acts of prostitution at the Red Roof Inn on Zumbehl road, on December 3, 2015. The police also had probable cause to believe that that some of the people involved the prostitution activities were also using drugs. The police had probable cause to believe that Parks drove the minivan that was then parked on the public lot in front of the police station. As the prostitution and human trafficking activities appeared to be part of a mobile operation, the police had probable cause to believe that evidence of human trafficking and prostitution crimes and controlled substance offenses would be found in Parks' minivan. Accordingly, under the automobile exception to the warrant requirement, Officer Yadlosky could lawfully conduct full search of Parks' minivan upon first observing it parked on the police parking lot on the morning of December 4, 2015.

Despite the fact that he could have immediately searched Parks' minivan, Officer

15

Yadlosky took a more measured approach. Officer Yadlosky first looked in the window and observed what he thought was a person covered and sleeping in the middle row. Officer Yadlosky knew that there was an unaccounted for juvenile traveling with Parks. Officer Yadlosky knocked on the window but the occupant did not respond. Officer Yadlosky then opened the van door to check on the well-being of the occupant.

Officer Yadlosky was justified in opening the vehicle door and looking inside, even if he lacked probable cause to search the minivan when he first observed it. Apart from the automobile exception, another exception to the warrant requirement "applies when police officers engage in a community caretaking function." United States v. Smith, 820 F.3d 356, 360 (8th Cir. 2016) (citing Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). See also United States v. Conerd, -- F.3d --, 2016 WL 3878223 at *2 (8th Cir. July 18, 2016) (warrantless entry into curtilage to look through window after reports of assault lawful under emergency aid exception). "Community caretaking functions are performed by law enforcement to 'help those in danger.'" Smith, 820 F.3d at 360 (quoting United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006)). "'A police officer may enter a [Fourth Amendment protected space] without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention.'" Id. (quoting Quezada, 448 F.3d at 1007). "'The officer's subjective motivation is irrelevant.'" Conerd, 2016 WL 3878223 at *2 (quoting Brigham City v. Stuart, 547 U.S. 398 (2006))

There can be little doubt that Officer Yadlosky had good reason to be concerned after he looked inside the minivan. Officer Yadlosky knocked on a window but the person inside did not respond. Officer Yadlosky knew that there was an unaccounted for juvenile. Thus, Officer Yadlosky had reasonable concern that the person inside may need his immediate attention.

16

Accordingly, apart from the automobile exception, Officer Yadlosky could lawfully open the minivan door without first obtaining a search warrant.

Once Officer Yadlosky opened the van door (whether it was pursuant to the automobile exception or the emergency aid exception) he smelled a strong odor of marijuana, observed suspected marijuana on the floor, and observed that the occupant appeared to be intoxicated or high. This odor would have justified a full warrantless search of the minivan, including containers, for illegal drugs. See United States v. Smith, 789 F.3d 923, 928-29 (8th Cir. 2015) (recognizing that the odor of illegal drugs coming from a vehicle provides probable cause to search the entire vehicle for drugs) (citing cases); United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994) (en banc); see also United States v. Stringer, 739 F.3d 391, 395 (8th Cir. 2014) (explaining that probable cause to search a car for drugs included searching "closed containers therein") (citing United States v. Ross, 456 U.S. 798, 820-21 (1982)); Coleman, 700 F.3d at 336 (explaining that probable cause to search a vehicle includes searching every part of the vehicle that might "conceal the object of the search"). Nonetheless, Officer Yadlosky again took a more measured approach to the search. Instead of conducting a full search of the minivan immediately upon smelling and observing drugs in the van, he sought the assistance of a drug detecting K-9 to verify the presence of controlled substances. It was only after the K-9 alerted to the presence of narcotics in Parks' minivan that the officers conducted a more thorough search of the vehicle. See United States v. Chartier, 772 F.3d 539, 545 (8th Cir. 2014) ("A dog sniff by a reliable drug dog that results in an alert on a vehicle gives an officer probable cause to believe there are drugs present.") (citing United States v. Donnelly, 475 F.3d 946, 955 (8th Cir. 2007)).

Finally, the fact that Parks had been, or would shortly be, arrested and could not possibly have moved the van does not render the automobile search in this case unreasonable or unlawful.

The Supreme Court has explained that, when the police have probable cause, they "may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." Michigan v. Thomas, 458 U.S. 259, 261(1982). See also Wells, 347 F.3d at 287-88 (quoting Thomas).

For the foregoing reasons, it is recommended that Parks' Motion to Suppress be denied.[12]

## II. <u>**Inevitable Discovery and Inventory Search**</u>

As a back-up, the government contends that, even if the police search of Parks' minivan was somehow unconstitutional, the evidence seized from the vehicle would have been inevitably discovered when the minivan was towed and inventoried by the St. Louis County Police.

Under the inevitable discovery exception, evidence that has been unlawfully seized may still be admissible "[i]f the government 'can establish … that the information ultimately or inevitably would have been discovered by lawful means ….'" United States v. Allen, 713 F.3d 382, 387 (8th Cir. 2013) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). See also Utah v. Strieff, -- S. Ct. --, 2016 WL 3369419 at *5 (June 20, 2016) ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source.") (citing Nix, 467 U.S. at 443-44). The "inevitable discovery exception applies when the government proves 'by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.'" United States v. McManaman, 673 F.3d 841, 846 (8th Cir. 2012) (quoting United States v. Conner, 127 F.3d 663,

---

[12] As noted above, after seizing mobile phones from Parks' minivan, investigators obtained a search warrant for the phones. Apart from his claim that the initial seizure of the phones was unlawful, Parks does not advance any other reason why any mobile phone evidence should be suppressed.

18

667 (8th Cir. 1997)).[13]  See also Allen, 713 F.3d at 387.

"Inventory searches may be conducted without a warrant or probable cause to search, United States v. Taylor, 636 F.3d 461, 464 (8th Cir. 2011), so long as they are reasonable under the totality of the circumstances, United States v. Hall, 497 F.3d 846, 851 (8th Cir. 2007)." Allen, 713 F.3d at 387.  An inventory search may serve as an alternative means of lawfully discovering evidence under the inevitable discovery exception.  See id.

At the evidentiary hearing in this cause, the government established that the St. Louis County Police Department became the lead investigating agency regarding Parks' alleged criminal activities.  Parks was in police custody no later than mid-morning, December 4, 2015.  Parks' minivan was parked in the public parking lot, in front of the St. Charles Police headquarters.  Sgt. Kavanaugh testified that Parks' minivan was towed from that parking lot pursuant to established procedures.  (See Gov't Exh. 2 at p. 6/12)  Those procedures further established that the minivan would be "thoroughly" inventoried as part of the standard towing procedures.  (See id. at p. 9/12)  Based on the testimony and evidence received at the evidentiary hearing, the undersigned concludes that the items seized from Parks' minivan would have been found during a thorough inventory search of the minivan.  Accordingly, even if the initial search of Parks' van was somehow unlawful, the items seized from the van should not be suppressed because those items would have been inevitably discovered and seized during the towing and inventory process.

---

[13] To be clear, the undersigned has concluded that the search of Parks' minivan was constitutionally sound.

19

## CONCLUSION

For the reasons set forth above, Parks' Motion to Suppress Evidence should be denied. Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence (ECF No. 53) be **DENIED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

The trial of this matter has been set for November 21, 2016, at 9:00 a.m., before the Honorable John A. Ross, United States District Judge.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this   19th   day of  September, 2016.